In re Joseph H. WHITNEY, Debtor.

**PARK NATIONAL BANK OF ST. LOUIS PARK, A National Banking Association, Plaintiff,**

v.

**Joseph H. WHITNEY, Park at City West, Inc., Asa E. Buttrick, and First Trust Company, Defendants.**

**and**

**Committee for the Unsecured Creditors of the Bankruptcy Estate of Joseph Hixon Whitney, Intervenor.**

**Bankruptcy No. 4–88–3885.**
**Adv. No. 4–89–35.**

United States Bankruptcy Court, D. Minnesota.

Dec. 1, 1989.

T. Jay Salmen, Julie Becker, St. Paul, Minn., for debtor.

Patrick Hennessy, James Michaels, Minneapolis, Minn., for plaintiff Park Nat. Bank.

Ann Morelli Spencer, Minneapolis, Minn., for defendant First Trust Co.

Steven Kluz, Minneapolis, Minn., for Intervenor Unsecured Creditors Committee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for trial on the 2nd and 3rd days of October, 1989. The primary issue at trial involved a crossclaim objecting to debtor's claimed exemption of a homestead he had purchased in anticipation of potentially filing a petition in bankruptcy. Appearances were as follows: T. Jay Salmen and Julie Becker for debtor Joseph Hixon Whitney ("Whitney"); Patrick Hennessy and James Michaels for plaintiff Park National Bank ("Park National"); Ann Morelli Spencer for defendant First Trust Company ("First Trust"); and Steven Kluz for the Unsecured Creditors Committee.[1] This Court has jurisdiction to hear and finally determine this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## FACTS[2]

Debtor is an individual engaged in the business of real estate development. One of debtor's several business ventures was the development of Park at City West, an apartment complex located in Eden Prairie, Minnesota. Debtor was the sole shareholder of two corporations, Tipton Corporation ("Tipton") and Phoenix Group, Inc., involved in that development project. Defendant Park at City West, Inc. ("City West") was a wholly owned subsidiary of Phoenix Group, Inc. Initially, Tipton was the general contractor on the apartment project. In the summer of 1987, City West was formed as a new corporation to assume the rights and obligations of Tipton as general contractor, including completing construction on the project and settling subcontractor claims.

By the summer of 1987, the project was 90% completed and approximately $2,000,000 over budget. St. Paul Mercury Insurance Company ("St. Paul Mercury") had issued payment and performance bonds on the project. In order to protect St. Paul Mercury against claims by subcontractors, Whitney and City West requested and received from Park National a letter of credit in the sum of $500,000.

The letter of credit was drawn upon by St. Paul Mercury on April 26, 1988. At the time of the draw, Park National asked for and obtained a personal Note from debtor in the sum of $500,000. The Note was secured by a pledge of debtor's substantial holdings of stock in AMP, Inc., a publicly traded company. At the time, everyone involved assumed the AMP stock was adequate security for all debtor's obligations to Park National.

By June of 1988, all subcontractor claims on the Park at City West project had been settled, and $99,664.41 of the proceeds of the letter of credit were applied to those claims. On June 29, 1988, a settlement was reached among St. Paul Mercury, Tipton, City West, debtor, and other contractors on the project. Pursuant to that settlement, the remaining $400,335.59 of proceeds from the draw were disbursed to debtor in accordance with a written agreement entered into on that date.

Debtor's fortunes had been deteriorating since the middle of 1987. His fortunes suffered greatly as a result of the October 1987 stock market crash, since many of his assets consisted of marketable stocks. In addition, he had personally guaranteed a debt to First Trust on a faltering shopping

---

**1.** Park At City West, Inc. and Asa E. Buttrick have not appeared in these proceedings.

**2.** The Court incorporates the parties' Stipulated Facts, filed September 27, 1989, and the Findings of Fact contained in my prior Memorandum Order dated September 26, 1989 [1989 WL 112787].

center development project. On December 17, 1987, First Trust obtained a $1,850,-368.36 judgment against debtor and two co-guarantors. After settling with the co-guarantors, First Trust began aggressive actions designed to obtain payment on the judgment from debtor personally. First Trust garnished debtor's bank accounts and attached and levied upon many of his other assets. Apparently, however, these attempts to collect were unsuccessful.

In January 1988, knowing that his financial condition was worsening, debtor consulted bankruptcy counsel. Throughout 1988, with the aid of such counsel, debtor attempted to work out his differences with several of his major creditors. During this same time he also took a series of actions to plan for a possible bankruptcy.

*First,* in January 1988, debtor borrowed $750,000 from a trust that had been created under his mother's will. In exchange for the loan, debtor transferred or pledged to the trust a large number of stocks, interests in real estate ventures and other securities. The evidence indicates that this was an arm's length transaction. The loan was for a one year term and bore interest commencing one year after the date it was made at the rate of 9%. There was no evidence presented as to how debtor used the funds from this loan.

*Second,* debtor bought a home. Debtor and his children had been living in a condominium in one of his failing real estate ventures. This, he testified, proved to be an unacceptable living accommodation. In the spring of 1988, he began looking for a new home. On June 25, 1988, debtor signed a Purchase Agreement on a property located in Edina, Minnesota. The purchase price was $280,000 in cash, and the closing was set for and did occur on July 12, 1989. Between June 25, 1988 and July 12, 1988, debtor received the $400,335.59 in excess proceeds from the draw on the letter of credit. He placed those funds in a trust account which was in the name of the law firm that had been rendering him bankruptcy advice. He deposited the funds in the trust account on the advice of counsel,

in part for the purpose of keeping the funds from being garnished by his creditors, including First Trust. At trial, debtor candidly admitted that he bought the home knowing that the effect of the purchase would be to shelter otherwise non-exempt assets from the reach of his creditors. At the closing, debtor used $280,000 in funds from the trust account to pay for the house, even though debtor could have obtained loans from his family for purchasing the home. The remaining portion of the excess proceeds in the trust account was used to pay his bankruptcy lawyers for past services, to pay other lawyers, to fund the operating deficits of Tipton, and to pay operating expenses for one of his oil and gas ventures. By July 12, 1988, by reason of these disbursements, there were no longer any proceeds from the draw on the letter of credit in the trust account.

*Third,* on July 8, 1988, debtor transferred virtually all his remaining assets to the family trust for no consideration. The trust is an independent entity, the trustees being his father and a family attorney. Debtor testified that the initial purpose of this action was to create a preferential transfer that would prevent his most aggressive creditors from receiving more than their fair share of his assets. His goal at the time, he testified, was to work out an arrangement with his creditors whereby they would share equally in what assets he still had.

At a meeting held on July 12, 1988 among debtor and his counsel and a large number of his creditors,[3] debtor made one final attempt at work out. He offered his creditors approximately 15% of their claims. At this meeting, either he or his counsel disclosed the fact that debtor had made the preferential transfer to the family trust and further disclosed that he had purchased the homestead. Debtor did not, however, disclose the prior existence of the attorneys' trust account or how he had handled the excess proceeds from the draw on the letter of credit.

---

**3.** At the time of the meeting, debtor owed those    creditors an estimated $7 million.

Debtor's efforts to effect an out-of-court work out with his many substantial creditors failed. On September 27, 1988 he filed a petition for relief under Chapter 11.

At trial, debtor testified that it was his purpose throughout to work out an arrangement with his creditors assuring them that they would be paid on a pro-rata basis. He testified that he has always been ready to use the assets he transferred to the trust on July 8, 1988, and even the home equity, to fund a reorganization plan.[4] Thus, while debtor admitted taking steps to shield assets from the reach of creditors prior to bankruptcy, he asserted that this was done with good intentions. He conceded at trial, however, that he knew the actions that he took would delay or impede creditors from reaching his assets.

### PROCEDURAL HISTORY

Park National commenced this action, alleging that the excess proceeds from the draw on the letter of credit were subject to a constructive trust in favor of Park National. Park National's claim of constructive trust was based on two alternative theories. Count One of the Complaint asserted that the excess proceeds of the draw on the letter of credit belonged to Park National; Count Two of the Complaint asserted that the excess proceeds belonged to City West, and that the transfer of those proceeds to Whitney constituted a fraudulent transfer. In addition, Count Three of the Complaint alleged that if the proceeds were subject to a constructive trust under either of the theories proffered in Count One and Count Two, Park National's interest in the proceeds would be superior to any interests Asa Buttrick or First Trust might have in the proceeds by virtue of judicial liens.

Prior to trial, I granted summary judgment dismissing with prejudice on the merits both Count One of Park National's Complaint and Whitney's crossclaim against First Trust alleging that First Trust had improperly settled with Whitney's co-defendants in First Trust's action against the shopping center co-guarantors. *See* Memorandum Order dated September 26, 1989.

During trial, I dismissed with prejudice on the merits both Count Two and the dependent Count Three of Park National's Complaint, for reasons stated on the record. I also granted judgment in Whitney's favor on his Counterclaim seeking to have Park National's claims of constructive trust dismissed and further seeking avoidance of a notice of *lis pendens* filed by Park National with respect to the Whitney homestead.

As a result of this series of judgments, there remains in this case but a single issue yet to be resolved: should debtor be entitled to claim as exempt the homestead he purchased with the excess proceeds from the draw on the letter of credit? Park National, First Trust and the Unsecured Creditors Committee have all asserted objections to that claim of exemption. They contend that the exemption should be disallowed because debtor purchased the home with actual intent to defraud his creditors. Debtor responds that he is entitled to the homestead exemption and has done nothing that should be deemed inappropriate pre-bankruptcy estate planning.

### DISCUSSION

#### A. Homestead Exemption

This case poses once again the question of whether a debtor should be denied an exemption[5] because of the nature and extent of his pre-bankruptcy estate planning. More specifically, the question before the Court is whether this debtor has acted with actual fraudulent intent, requisite for a denial of exemption, or whether he simply has planned astutely for life after bankruptcy.

Under 11 U.S.C. § 522(b), a debtor is entitled to exempt certain types of prop-

---

**4.** Debtor has said nothing about his intentions in the event this Chapter 11 case is converted to a Chapter 7.

**5.** This issue also plays itself out in the context of objections to discharge. *See* 11 U.S.C. § 727(a)(2).

erty from the claims of his creditors, or he may rely on state exemptions instead. *Hanson v. First Nat'l Bank*, 848 F.2d 866, 868 (8th Cir.1988). Debtor was entitled to and did elect to claim the exemptions provided for by Minnesota statute. Because debtor claimed a state-created exemption, the scope of the debtor's right to that exemption is determined as a matter of state law. *Id.; Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 79 (8th Cir.1989). Under Minn.Stat. § 510.01, debtor is entitled to exempt his homestead no matter what its value.[6] Minnesota's homestead exemption is limited solely by size of the tract of land on which the homestead is located.

■ It is well settled that pre-bankruptcy conversion of non-exempt assets into exempt assets is not sufficient, standing alone, to deprive a debtor of the exemption to which he would otherwise be entitled under state law. *See Forsberg v. Security State Bank*, 15 F.2d 499, 501 (8th Cir.1926); *Bank of Pa. v. Adlman, (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir.1976); *First Tex. Sav. Ass'n v. Reed*, 700 F.2d 986, 991 (5th Cir.1983). This is true even if the debtor acts with the express purpose of placing property beyond the reach of creditors and even though the debtor is insolvent at the time. *Forsberg*, 15 F.2d at 501. "The practice [of converting non-exempt to exempt assets] is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5862. Denial of an exemption must rest, instead, on proof that the debtor acted with the requisite actual intent to defraud creditors. *Hanson*, 848 F.2d at 868. The burden of proof is on the party objecting to a claim of exemption to establish such fraudulent intent. Bankr.R. 4003(c). Since it is the rare debtor who admits to having transferred property with fraudulent intent, such intent is almost always established through proof by extrinsic evidence.

*See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir.1986).

■ Since pre-bankruptcy planning is not *per se* improper, courts have used a variety of tests to determine how much, in addition to and apart from the conversion of assets, is enough to establish the requisite intent. Some cases examine the debtor's motivation as a factor. For instance, courts have held that if the debtor's motivation was solely to remove property from the reach of creditors with no intention of using it, the act may be wrongful. *See, e.g., Ford v. Poston (In re Ford)*, 53 B.R. 444 (W.D.Va.1984), *aff'd* 773 F.2d 52 (4th Cir.1985). Another approach is euphemistically referred to as "pigs and hogs" analysis. This approach recognizes that, while some limited pre-bankruptcy estate planning is appropriate, wholesale conversion of non-exempt assets into exempt assets is not. *See, e.g., Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154 (Bktcy. D.N.M.1981).

The analysis in most cases, however, has rested on a "badges of fraud" approach. *See, e.g., Johnson*, 880 F.2d at 82. These badges of fraud may include conduct intentionally designed to mislead or deceive creditors, conveyances of property for less than adequate consideration, or conveyances which are illusory because the debtor retains possession and control of the property. *Id.* Courts often look to the financial situation of the transferror at transfer, whether there has been a series of questionable transactions, and to the general chronology of events. *See, e.g., Reed*, 700 F.2d at 991; *Norwest Bank Neb. v. Tveten (In re Tveten)*, 70 B.R. 529, 534 (Bktcy.D. Minn.), *aff'd* 82 B.R. 95 (D.Minn.1987), *aff'd* 848 F.2d 871 (8th Cir.1988). Under a "badges of fraud" analysis, it may be especially significant that the debtor engaged in covert activity, sold collateral to fund the conversion, or borrowed money to fund the conversion. *See, e.g., Reed*, 700 F.2d at 989 (activities included use of a secret bank

---

**6.** The question of whether such an unlimited exemption violates Minnesota's Constitution has been answered in the negative by the Minnesota Supreme Court. *In re Haggerty*, 448 N.W.2d 363 (Minn.1989) (*en banc*).

account); *McCormick v. Security State Bank,* 822 F.2d 806 (8th Cir.1987) (debtor diverted funds to secret accounts and then lied to his creditors about the whereabouts of his assets).

These various tests, applied in the context of either an objection to discharge or an objection to exemption, have been the subject of much litigation here and elsewhere. The subject has been addressed a number of times in this district, and most recently has been the focus of three decisions of the Court of Appeals for the Eighth Circuit. *See Hanson,* 848 F.2d 866; *Tveten,* 848 F.2d 871; *Johnson,* 880 F.2d 78. Some have viewed the bankruptcy court decisions in the two cases emanating from this district, *Tveten* and *Johnson,* as conflicting and irreconcilable. *See* Comment, *The Night Before Bankruptcy: The Eighth Circuit's Response to Bankruptcy Estate Planning,* 15 Wm. Mitchell L.Rev. 643, 644 (1988). *Compare Tveten,* 70 B.R. 529, and *Panuska v. Johnson (In re Johnson),* 80 B.R. 953 (Bktcy.D.Minn.1987), *aff'd* 101 B.R. 997 (D.Minn.1988), *aff'd* 880 F.2d 78. As one member of the Eighth Circuit has opined, some will conclude that the Eighth Circuit decisions themselves cannot be reconciled, except on a subjective basis. *Hanson,* 848 F.2d at 870–71 (Arnold, J., concurring).[7] With so much written and so little agreement, the task for this Court is to attempt to apply the dictates of recent Eighth Circuit decisions to the facts at hand.

In *Tveten,* a Minnesota doctor converted more than $700,000 of non-exempt assets and exempt assets (including his homestead) into exempt annuities which could easily be converted into cash. *Tveten,* 848 F.2d at 872–73. The bankruptcy court found that the wholesale nature of the debtor's actions, the amounts involved, and the cash-equivalency nature of the exempted assets adequately established the fraudulent intent necessary to deny discharge under the Bankruptcy Code. *See* 11 U.S.C. § 727(a)(2); 11 U.S.C. § 1141(d)(3)(C). The

Eighth Circuit affirmed. *Tveten,* 848 F.2d at 876–77.

A seemingly contrary result was reached in *Hanson,* wherein the Eighth Circuit affirmed a bankruptcy court decision that allowed the debtors to exempt their homestead and life insurance policies even though the debtors had intentionally converted non-exempt assets into the homestead and exempt insurance policies prior to the bankruptcy filing. In *Hanson,* the debtors were persons of modest means, and the amount involved was only slightly over $35,000. *Hanson,* 848 F.2d at 867. The *Hanson* court relied on the bankruptcy court's finding that the traditional badges of fraud, such as borrowing to effect the conversion, concealment of assets from creditors, or sale of assets at less than fair value, were not present. *Id.* at 869.

Finally and most recently in *Johnson,* the Eighth Circuit again held that an exemption was valid because there was insufficient extrinsic evidence of fraudulent intent. *Johnson,* 880 F.2d at 84. The *Johnson* court held that the bankruptcy court had not clearly erred when it overruled an objection to discharge based on debtor's conversion of approximately $175,000 in non-exempt assets into his homestead. *Id.* at 79–80. But the Court of Appeals remanded the case for the bankruptcy court to determine whether the debtor's other substantial conversions were of a nature or amount sufficient to support a denial of discharge. *Id.* at 84.

■ While this trilogy of recent Eighth Circuit cases leaves some cause for confusion, one point *is* abundantly clear: the *Tveten* approach of considering the value of the converted assets has no application where the issue is an objection to a claim of homestead exemption. In *Johnson,* the debtor, upon advice of counsel, used earnings and proceeds from the sale of non-exempt assets to pay off $175,000 in debts secured against his home, which was

---

7. It has been suggested that the only way to reconcile the Eighth Circuit opinions on this subject is to recognize that each of them affirmed the bankruptcy judge's finding of fact on

intent, which could have been overturned only if the finding was clearly erroneous. Comment, 15 Wm. Mitchell L.Rev. at 677–78.

valued at $285,000. He also converted over $250,000 in income and non-exempt assets into assets such as annuities, individual retirement accounts, musical instruments and life insurance policies for which he then believed Minnesota statutes provided exemptions unlimited as to amount. *Johnson*, 880 F.2d at 79. The debtor admitted that his purpose in making these conversions was to protect assets from his creditors. *Johnson*, 80 B.R. at 956. Resting its decision on the strong Minnesota public policy in favor of protecting the homestead, the *Johnson* court unequivocally held that bankruptcy courts *may not* take into consideration the amount of funds protected in the homestead in determining whether the debtor acted with fraudulent intent:

> The homestead exemption is of a sufficiently distinct character that the value-limit analysis of *Tveten* and *Tveten* (advisory) does not apply.

*Johnson*, 880 F.2d at 84.

In order for an objection to a homestead exemption to be sustained, the objector must prove the debtor's alleged fraudulent intent with evidence in addition to and apart from the value of the non-exempt assets converted. *Id.* at 83. Thus, the fact that the debtor in the instant case placed $280,000 into his homestead, and as a result will be living in the comfort of an abode many would view as extravagent, is irrelevant to the issue of intent. If this seems unfair or unjust, it is an inequity spawned by Congress' decision to allow state exemptions as an alternative to the federal exemptions, and by the fact that the debtor was a person of more than ordinary means at the start.[8] In the instant case, the only issue before me relates to the homestead exemption, and therefore I must determine whether the objectors have presented sufficient extrinsic evidence of fraud in addition to and apart from debtor's wholesale conversion of non-exempt assets into a high-priced homestead:

> [E]xtrinsic evidence can be composed of: further conduct intentionally designed to materially mislead or deceive creditors about debtor's position; conveyances for less than fair value; or, the continued retention, benefit or use of property allegedly conveyed together with evidence that the conveyance was for inadequate consideration.

*Id.* at 82.

The Unsecured Creditors Committee asserts that the debtor in the instant case, like the debtor in *Tveten*, has admitted a purpose and intent to remove funds from the reach of creditors, which admission alone is sufficient to make this case more factually similar to *Tveten* than to *Johnson*. According to counsel for the Unsecured Creditors Committee, debtor's admission has made the search for extrinsic evidence of fraud unnecessary. I disagree. It is true that in the bankruptcy court's decision in *Tveten*, Chief Judge Kressel relied on the debtor's admission in finding fraudulent intent. *Tveten*, 70 B.R. at 535. But that statement alone does not convey a complete picture of the facts of that case, and I doubt the admission was the only basis for the decision. Furthermore, the debtor in *Johnson* made exactly the same admission, yet the Court of Appeals held that the bankruptcy court was nonetheless required to look for extrinsic evidence of fraud. It seems to me that a debtor would patently lack credibility if he testified that he converted non-exempt property to exempt property without any intent to remove that property from the reach of creditors; that is the very purpose of pre-bankruptcy estate planning. *See* Comment, 15 Wm. Mitchell L.Rev. at 680. "Wanting to preserve as much of one's property in spite of bankruptcy is a natural human desire and a home is often a debtor's largest asset." *In re Haggerty*, 448 N.W.2d 363, 368. Consequently, I find that debtor's admission alone is not adequate to show

---

**8.** "Suffice it to say ... that not all debtors are created equal. While an overly generous exemption statute is of little use to debtors with meager resources, debtors with abundant assets are able to reallocate their wealth to maximize exemptions. Fresh start then is by no means a static concept. Some debtors, through no fault of their own, will have a fresher start than others who are less fortunate. This is a fact of life in a land of opportunity." Comment, 15 Wm. Mitchell L.Rev. at 678.

that he acted with fraudulent intent when he converted non-exempt assets into his homestead.

■ Furthermore, I find here none of the traditional badges of fraud sufficient to evidence wrongful intent. I have previously determined that the sums debtor used to make the purchase of his homestead were his to deal with as he chose. He did not borrow from creditors to make the investment. He did not sell collateral to fund the investment. There was nothing materially covert about the way he dealt with his creditors. He accounted to them for his assets. Moreover, debtor needs the home as a place to live. Given his background, his selection of a home of this value is certainly not unusual.

First Trust argues that there is ample extrinsic evidence of fraud here, including, in particular, the fact that debtor was being harassed by his creditors, that debtor knew of First Trust's significant judgment against him, that debtor temporarily "parked" the excess proceeds from the draw on the letter of credit in his attorney's trust account where it could not be reached by creditors, and that debtor failed to disclose his use of the attorney's trust fund to his creditors at the meeting on July 8, 1988. I conclude that these facts do not approach the type of covert dealing in assets sufficient to support a finding of fraudulent intent. *Cf. McCormick,* 822 F.2d at 808 (debtor lied to his creditor and covertly transferred funds to and from various accounts). At the time the transfers to the trust account occurred, debtor had already signed a Purchase Agreement on his home. The "parking" of assets, if it did occur, was temporary and of very short duration.

For these reasons I find that the objecting parties have failed to prove that debtor acted with the actual intent to defraud necessary to deny him the exemption on his homestead.

### B. Sanctions

At the commencement of trial, debtor moved for an award of attorneys fees and expenses which would be incurred in connection with the trial. It was and is debtor's position that counsel for the Unsecured Creditor's Committee, First Trust and Park National were pursuing a claim that they should have known, after reasonable inquiry, had no basis in law or in fact and that could not be supported by a good faith argument for extending or changing the current law. Debtor particularly relied on the Eighth Circuit's recent decision in *Johnson* and on my own decision in *In re Ernest H. Johnson,* No. 6–88–594, 1989 WL 81184 (Bktcy.D.Minn. July 21, 1989), both of which dealt with the homestead exemption in the context of pre-bankruptcy estate planning, and both of which allowed conversion of non-exempt assets into exempt homestead properties.

■ I decline to award sanctions under Bankruptcy Rule 9011. I do not choose to repeat what has been said many times before about Rule 9011 (or its federal rule counterpart, Fed.R.Civ.P. 11). But I will say that, in my view, Rule 9011 dictates that lawyers make reasonable inquiry into law and fact, assess in good faith the possibility of successfully expanding or altering the law, and refrain from unnecessarily prolonging litigation for wrongful purpose. The rule is in part a quality control mechanism, mandating a *minimal* level of competence from the participants in the litigation process. There was nothing wrong with the quality of the lawyering in this case. Counsel for all parties conducted themselves carefully, competently and civilly. The law was changing and may still change further. Under these circumstances, it would be inappropriate to chill able advocacy by an award of sanctions against the losing parties.

ACCORDINGLY, IT IS HEREBY ORDERED:

1. The findings read into the record during trial should become part of the basis of this opinion pursuant to Bankruptcy Rule 9052.

2. The Complaint of Park National is dismissed with prejudice on the merits.

3. The claims, counterclaims and cross-claims of First Trust are dismissed with prejudice on the merits.

4. Debtor's crossclaim against First Trust is dismissed with prejudice on the merits.

5. Debtor shall have judgment in his favor with respect to his counterclaim against Park National.

6. The objections by Park National, First Trust and the Unsecured Creditors Committee to debtor's claims of exemption of his homestead are overruled. Debtor shall be entitled to claim as exempt the property at 4628 Casco Avenue, Edina, Minnesota.

7. Costs and disbursements are awarded in favor of defendants.

8. No attorneys fees are awarded to any party.

LET JUDGMENT BE ENTERED ACCORDINGLY.