In re Robert James JOHNSON, Debtor.

Harold J. PANUSKA as trustee for the Harold J. Panuska Profit Sharing Trust and the Harold J. Panuska Employee Trust Fund, Appellant,

v.

Robert James JOHNSON, Appellee.

No. 88–5296.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1989.

Decided July 13, 1989.

Rehearing and Rehearing En Banc Denied Aug. 16, 1989.

Gordon B. Conn, Jr., Minneapolis, Minn., for appellant.

Cass S. Weil, St. Paul, Minn., for appellee.

Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and FAGG, Circuit Judge.

HEANEY, Senior Circuit Judge.

In anticipation of his bankruptcy, Robert Johnson converted approximately $400,000 in assets into property exempt from his creditors' claims under Minnesota law. Petitioner, a creditor, objected to granting Johnson a discharge, arguing that Johnson had committed fraud. The bankruptcy court, granted a discharge to Johnson. The district court affirmed. We agree that there is no fraud as to Johnson's homestead exemption but remand for the bankruptcy court's reconsideration of the other issues in light of this opinion.

## I. BACKGROUND

### A.

Johnson is a doctor and was a partner in the Rice Street Clinic in St. Paul. He invested in a real estate enterprise, Growth Ventures Inc. (GVI), and gave personal guarantees for GVI's indebtedness. GVI encountered substantial financial difficulty, and GVI's creditors obtained judgments against Johnson and other investors. After consulting with a bankruptcy attorney, Johnson began to convert some of his assets into property exempt from his creditors' reach. Using professional income and proceeds from the sale of assets, he paid off $175,000 in debts secured against his home. He paid off a $100,000 first mortgage held by Twin City Federal Savings and Loan Association, a second mortgage held by First Bank Grand, and a marriage dissolution lien in favor of his ex-wife. The value of his homestead is approximately $285,000, with one remaining encumbrance of undetermined value. During this period, Johnson converted income and assets into annuities and individual retirement accounts worth $247,784.22 purchased from the Modern Woodmen's Association. He also purchased $4,000 in life insurance and he converted personal property and assets into musical instruments worth more than $8,000. He surrendered his remaining nonexempt assets and filed for liquidation under Chapter 7 of the Bankruptcy Code on January 24, 1986.

### B.

The Bankruptcy Code permits debtors to exempt property from distribution to creditors pursuant to provisions of state law. 11 U.S.C. § 522(b)(2) (1982). The scope of the exemption is fixed by state law, but the debtor's right to discharge is determined by federal law. *Norwest Bank Nebraska v. Tveten*, 848 F.2d 871, 874 (8th Cir.1988) (*Tveten*). At the time, Minnesota categorized various types of property as exempt, including a person's homestead, musical instruments, financial plans purchased from fraternal associations, and life insurance. Minn.Stat. § 510.01 *et seq.* (homestead), § 550.37 (subd. 2) (musical instruments), § 550.37 (subd. 11) (fraternal associations), § 550.39 (life insurance).

The appellant objects to Johnson's discharge, arguing that Johnson's actions fall under an exception to discharge for acts done with an intent to hinder, delay or defraud creditors. 11 U.S.C. § 727(a)(2) (1979).[1] The appellant acknowledged be-

---

1. This section provides:

§ 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated,

fore the bankruptcy court, however, that none of these transfers are voidable for inadequate consideration. Instead, the appellant argued that Johnson's conduct constituted fraud because Johnson was intentionally trying to insulate property from his creditors.

The bankruptcy court rejected the appellant's arguments. That court held that intent to shift property into forms exempt under state law was not sufficient to constitute fraud. "As a matter of law" the bankruptcy court held that under the Bankruptcy Code further conduct, such as concealing his actions, was required to prevent Johnson's discharge. *In re Johnson*, 80 B.R. 953, 957 (Bankr.D.Minn.1987). Johnson, however, had not misled or deceived anyone. *Id.* at 958. He simply made significant use of the Minnesota exemptions. Thus, the bankruptcy court concluded that Johnson was entitled to a discharge.

> In short, then, this Court declines to equate the intent presented here with an intent to "hinder, delay or defraud creditors" under 11 U.S.C. § 727(a)(2). Debtor did not engage in the kiting of assets between various locations and forms of ownership and character, accompanied by overt misrepresentations and fraudulent concealment, which the Eighth Circuit excoriated in *McCormick* [*v. Security State Bank*, 822 F.2d 806 (8th Cir. 1987) ]. Debtor rather made a conscious, if selfish, effort to fully avail himself of the full range of debtor protections afforded by the Minnesota state legislature, in a fashion which had been explicitly condoned by decisions of both state and federal courts in Minnesota. The fact that the actions and their results were wholly self-serving is immaterial. * * * Debtor did nothing more than exercise a prerogative that was fully his under law. It cannot be said that his actions have so tainted him or his bankruptcy petition as to merit denial of discharge.

*Id.* at 963 (footnotes omitted).

In light of a subsequent decision by the Minnesota Supreme Court, Johnson's annu-

ities and retirement accounts are no longer exempt. *In re Tveten*, 402 N.W.2d 551 (Minn.1987) (*Tveten* (advisory)). This leaves only three exemptions in dispute: the homestead, the life insurance and the musical instruments. We begin by reviewing the governing law.

## II. DISCUSSION

### A.

After the bankruptcy court's decision in this case, we decided *Tveten* and *Hanson v. First National Bank*, 848 F.2d 866 (8th Cir.1988). These two decisions set forth the governing law.

Tveten was a doctor who had invested in GVI, along with Johnson. Like Johnson, he engaged in pre-bankruptcy planning designed to convert significant assets into exempt property. Unlike Johnson, Tveten converted most of his assets, even his homestead, into annuities and life insurance. Tveten also proposed to reorganize his position under Chapter 11 of the Bankruptcy Code. The bankruptcy court certified questions regarding the scope and constitutionality of the Minnesota exemption statute to the Minnesota Supreme Court.

The Minnesota Supreme Court struck down a provision of the exemption law as unconstitutional. Minnesota law exempted annuities and life insurance contracts in unlimited amounts purchased from fraternal benefit societies. Minn.Stat. § 550.37, subd. 11. The Supreme Court concluded, however, that because this subdivision of the Minnesota law did not set a limit on the amount of property exempted, it violated the state constitution which allows exemptions only for "[a] reasonable amount of property * * *." *Tveten* (advisory), 402 N.W.2d at 557–58 (M.S.A. Const. Art. 1, § 12). The Minnesota Supreme Court also found subdivision 11 unconstitutional for bestowing a special benefit on fraternal organizations. *Id.* at 558–60.

---

or concealed—[property of the debtor or estate].

Courts generally view this language as establishing a single test. We do not endeavor to separate out the terms fraud, hinder and delay.

While awaiting the Minnesota Supreme Court's opinion, the bankruptcy court considered the availability of discharge under federal law. That court noted that to establish fraud there must be extrinsic evidence of fraudulent intent in addition to mere lawful conversions into exempt property. The court considered that Tveten had attempted to classify a substantial amount of property as exempt, approximately $700,000. In addition, rather than preserving some part of his prior estate, Tveten had converted his homestead, stocks, retained earnings and employee retirement plan into future liquid income which he could cash in immediately after discharge. *In re Tveten*, 70 B.R. 529, 534 (Bankr.D.Minn.1987). The bankruptcy court concluded from all the facts that there was an intent to defraud.

> Even if the exemptions are allowed, Tveten's conduct in transferring the assets amounts to nothing more than an attempt to defraud creditors, and an abuse of the Bankruptcy Code. * * * This is not a case like *Forsberg* [*v. Security State Bank*, 15 F.2d 499 (8th Cir.1926)] where the debtor converted property before bankruptcy in order to take advantage of reasonable exemptions provided by state law. Rather, Tveten converted substantial amounts of property into cash and now claims approximately $700,000 in assets as exempt.

*Id.* at 533–34. Because *Tveten* was a Chapter 11 proceeding, that court withheld judgment on Tveten's discharge pending submission of a reorganization plan. Tveten sought interlocutory appeal of the bankruptcy court's initial findings. The district court treated the bankruptcy court's conclusions as findings of fact, and affirmed. *Norwest Bank Nebraska v. Tveten*, 82 B.R. 95 (D.Minn.1987).

The Hansons were South Dakota farmers who filed for liquidation under Chapter 7. They sold non-exempt assets to family members for fair consideration. With the proceeds, they purchased two life insurance policies with a combined cash surrender value of $19,955. The Hansons also prepaid $11,033 on their homestead's mortgage. The bankruptcy court found no extrinsic evidence of fraud and the district court affirmed that finding as not clearly erroneous. *Hanson*, 848 F.2d at 867–68. In that case, state law limited exempt life insurance proceeds to $20,000 and placed no value limit on the homestead exemption. S.D.Codified Laws Ann. § 43–45–3 (1983) (homestead), § 58–12–4 (1978) (life insurance).

■ We considered these two cases together to decide under federal law what conduct would make discharge unavailable. We recognized that separating ordinary pre-bankruptcy planning from fraudulent action is difficult. The law permits debtors to intentionally transform property into exempt assets. The exemptions allow a debtor to carry over certain types of property with which to make a fresh start. *Tveten* and *Hanson* reaffirmed the longstanding view that the desire to convert assets into exempt forms by itself does not constitute fraud; extrinsic evidence of fraudulent intent is required to establish fraud. *Hanson*, 848 F.2d at 868; *Tveten*, 848 F.2d at 873–74. In both cases, rather than setting forth either what fraudulent intent is, as compared to the ordinary use of lawful exemptions, or what extrinsic evidence might prove the existence of fraudulent intent, we satisfied ourselves with illustrating the rule by example. *See, e.g., Tveten*, 848 F.2d at 874–76 (discussing *Ford v. Posten*, 773 F.2d 52 (4th Cir.1985), and *In re Ellingson*, 63 B.R. 271 (Bankr.N.D.Iowa 1986)).

In *Tveten*, our Court reviewed the bankruptcy court's finding that there was fraudulent intent under the clearly erroneous standard and we affirmed. We noted that state laws which included limits on the value of the exempt property were consistent with the federal policy in favor of allowing a debtor to make a fresh start. *Tveten*, 848 F.2d at 875. But in *Tveten*, the debtor had converted $700,000 into liquid assets that Minnesota law would no longer recognize as exempt. In light of the amounts of property and types of property Tveten attempted to exempt, we did not find the bankruptcy court's finding of

fraud clearly erroneous. *Id.* at 876.[2] *Hanson* applied the same decisional rules to affirm a grant of discharge. We decided that the bankruptcy court's finding that the Hansons had acted without the requisite intent in purchasing some life insurance and making some prepayments on their mortgage was not clearly erroneous. We illustrated that view by contrasting their conduct with the conduct of other debtors. *Hanson,* 848 F.2d at 868–69 (discussing *In re Cadarette,* 601 F.2d 648 (2d Cir.1979), and *In re Olson,* 45 B.R. 501 (1984)).

■■■ We read *Tveten* and *Hanson* to reaffirm the rule that conduct sufficient to defeat discharge requires indicia of fraud beyond mere use of the exemptions. Under *Tveten, Hanson,* and the cases they discuss, extrinsic evidence can be composed of: further conduct intentionally designed to materially mislead or deceive creditors about the debtor's position; conveyances for less than fair value; or, the continued retention, benefit or use of property allegedly conveyed together with evidence that the conveyance was for inadequate consideration. In addition, *Tveten* establishes that where an exemption, other than a homestead exemption, is not limited in amount, the amount of property converted into exempt forms and the form taken may be considered in determining whether fraudulent intent exists.[3]

### B.

In considering value, as *Tveten* permits, bankruptcy courts must keep in mind the social policies which generate exemptions. " '(1) To provide the debtor with property necessary for his physical survival; (2) To protect the dignity and the cultural and religious identity of the debtor; (3)

To enable the debtor to rehabilitate himself financially and earn income in the future; (4) To protect the debtor's family from the adverse consequences of impoverishment; (5) To shift the burden of providing the debtor and his family with minimal financial support from society to the debtor's creditors.' "

*Tveten,* 848 F.2d at 876 (quoting Resnick, *Prudent Planning or Fraudulent Transfer?,* 31 Rutgers L.R. 615, 621); *see also, In re Ellingson,* 63 B.R. at 277–78. These policies, implicit in the Bankruptcy Code and state law, have as their aim the provision of property to the debtor useful to his continuing survival. Each state's selection and structuring of their exemptions reflects judgments about particular state interests. Variations in the law are sanctioned by Congress' choice to allow the states to fix their own exemptions. In deciding whether to invade a prerogative bestowed on the states by Congress, we must first consider the importance of the claimed exemption in furthering state objectives.

Minnesota's homestead exemption secures a right guaranteed to its citizens in the State Constitution. M.S.A. Const. Art. I, § 12. The exemption is limited by acreage rather than by monetary value. Minn. Stat. § 510.02. Despite the analysis contained in *Tveten* (advisory), the Minnesota Supreme Court steadfastly refuses to invalidate this legislative judgment as unconstitutional in light of Minnesota's strong social policy in favor of homestead exemptions. *Title Insurance Co. v. Agora Leases, Inc.,* 320 N.W.2d 884, 885 (Minn.1982); *Jacoby v. Parkland Distilling Co.,* 41 Minn. 227, 43 N.W. 52, 53 (1889); *Cogel v. Mickow,* 11 Minn. 354, 356 (Gilfillan 1866).

---

**2.** The bankruptcy court eventually confirmed Tveten's revised reorganization plan. *In re Tveten,* 97 B.R. 541 (Bankr.Minn.1989).

**3.** Judge Arnold disagreed with this approach. [W]hether exemptions are limited in amount is a legislative question ordinarily to be decided by the people's elected representatives, in this case the Minnesota Legislature. * * * The problem is simply not one susceptible of a judicial solution according to manage-

able objective standards. In effect, the Court today leaves the distinction between permissible and impermissible claims of exemption to each bankruptcy judge's own sense of proportion.
*Tveten,* 848 F.2d at 878–79 (Arnold, J., dissenting). For different approaches, see *In re Smiley,* 864 F.2d 562, 566–69 (7th Cir.1989) (disagreeing with *Tveten* and collecting cases).

This state has long recognized the importance, notwithstanding the just demands of creditors, for a debtor's home to be a "sanctuary." *Denzer v. Prendergast*, 267 Minn. 212, 216, 126 N.W.2d 440, 443 (1964). This "wise and humane policy" is not just for the debtor's benefit, but is also "in the interest of the state, whose welfare and prosperity so largely depend upon the growth and cultivation among its citizens of feelings of personal independence, together with love of country and kindred—sentiments that find their deepest root and best nourishment where the home life is spent and enjoyed." *Ferguson v. Kumler*, 27 Minn. 156, 159, 6 N.W. 618, 619 (1880).

*Cargill v. Hedge*, 375 N.W.2d 477, 479 (Minn.1985).

The homestead law is to be liberally construed. It would not be wholesome to construe the statute as conserving lawful homes only. To do so would tend to increase the burdens of the community chest; destroy homes; divide families; and increase the population of our orphan asylums. We construe our homestead law as relating to all debtors. It does not prescribe personal qualifications touching the moral character of the debtor; and upon principle and reason we see no justification for excluding from its protection the vicious, the criminal, or the immoral. All must live, and right consideration should contemplate not only the living but the next generation. This statute rests upon the thought of family. Our established policy is not restricted to right-thinking or right-acting persons; but sounds in hope for the future both as to the debtor and his children.

*Ryan v. Colburn*, 185 Minn. 347, 241 N.W. 388, 389 (1932); *see also, Eustice v. Jewison*, 413 N.W.2d 114, 119 (Minn.1987) (liberal construction). Thus, the Minnesota Supreme Court does not impose a value limit on its homestead exemption as it chose to do with a different exemption in *Tveten* (advisory).

■ We conclude that federal courts should similarly respect this legislative judgment in determining eligibility for discharge. It is obvious that Minnesota's homestead policy reflects a considered state judgment about the organization of everyday life in that state. *Cf., Hanna v. Plumer*, 380 U.S. 460, 474–75, 85 S.Ct. 1136, 1145–46, 14 L.Ed.2d 8 (Harlan, J., concurring). Mere use of the exemption is not fraud under state law. *Jacoby*, 43 N.W. at 52. We have recognized that no exemption is more central to the legitimate aims of state lawmakers than a homestead exemption. Our support of the homestead exemption is longstanding. In *First National Bank v. Glass*, 79 Fed. 706, 707 (8th Cir.1897), Judge Sanborn wrote:

An insolvent debtor may use with impunity any of his property that is free from the liens and the vested equitable interests of his creditors to purchase a homestead for himself and his family in his own name. If he takes property that is not exempt from judicial sale and applies it to this purpose, he merely avails himself of a plain provision of the constitution or the statute enacted for the benefit of himself and his family.

*Accord: Forsberg v. Security State Bank*, 15 F.2d 499 (8th Cir.1926); *Crawford v. Sternberg*, 220 Fed. 73 (8th Cir.1915) ("preventing the forced loss of the home"). Where such an important state policy is at issue, we should not impose an arbitrary monetary limit. *Keleher v. Technicolor Government Services*, 829 F.2d 691 (8th Cir.1987) (respecting liberal construction of South Dakota homestead exemption); *O'Brien v. Heggen*, 705 F.2d 1001 (8th Cir. 1983) (applying Minnesota's acreage limit); *c.f. In re Olson*, 45 B.R. 501 (Bankr.Minn. 1984).

■ We hold that *Tveten* does not apply to homestead exemptions absent traditional extrinsic evidence of fraud unrelated to the amount of money involved. In addition, we remind the lower courts that there is nothing fraudulent per se about making even significant use of other legal exemptions. Ultimately, fixed dollar limits on the use of exemptions must be set by legislatures. *Tveten* and *Hanson* sanction an exceptional use of judicial discretion. In light of the danger that judges will inadvertently fix

inconsistent or arbitrary limits on the statutory exemptions, we must err in favor of the debtor. The power sanctioned in *Tveten* should be reserved for exceptional cases and has no application to homestead exemptions.

## III. DISPOSITION

### A.

 In this case, the bankruptcy court believed that as a matter of law fraudulent intent could never be established by the size of the exemptions sought. In light of *Tveten*, with respect to most exemptions, this view is now erroneous. The district court nevertheless affirmed the bankruptcy court after *Tveten* was announced, concluding that functionally the bankruptcy court had come to a conclusion of fact that there was no fraud in this case. That is not quite true. We understand the bankruptcy court to have found no extrinsic evidence of fraud and concluded that as a matter of law thus there could be no fraud. In this light, we are only able to agree with the bankruptcy court in part.

At this stage Johnson has been reduced to claiming only the homestead exemption, musical instruments exemption and life insurance exemption. The homestead exemption is of a sufficiently distinct character that the value-limit analysis of *Tveten* and *Tveten* (advisory) does not apply. Because the bankruptcy court found no evidence involving his mortgage payments and his payment to his ex-wife to show that he intended to defraud his creditors by these actions, we hold that he is entitled to his homestead exemption. The amount of money involved in this exemption is irrelevant to a determination of whether, on all the facts, Johnson intended to defraud his creditors.

Because other exemptions have been claimed which must be examined for fraudulent intent under the standards announced in *Tveten*, we must remand this case to the bankruptcy court for a fresh determination of the ultimate question of fraud. The bankruptcy court must decide with respect to the remaining exemptions if the facts, including the amounts involved, show fraud.

### B.

Accordingly, we remand this case to the district court with instructions that it be remanded to the bankruptcy court for disposition consistent with this opinion.