In re Marvin James CRATER and Fay B. Crater, Debtors.

James D. Murphey, Plaintiff,

v.

Marvin James Crater and Fay B. Crater, husband and wife, Defendants.

Bankruptcy No. 01–12851–PHX–RJH. Adversary No. 02–00007.

United States Bankruptcy Court, D. Arizona.

Dec. 17, 2002.

**758**

Tim D. Coker, Esq., Robert Mothershead, P.C., Phoenix, AZ, for Plaintiff/Creditor.

William F. Doran, Esq., Phoenix, AZ, for Defendants/Debtors.

Louis Movitz, Carefree, AZ, Chapter 7 Trustee.

## OPINION RE: OBJECTION TO DISCHARGE

RANDOLPH J. HAINES, Bankruptcy Judge.

This case concerns an objection to discharge due to the debtors' prebankruptcy sale of an asset and use of the proceeds to increase an exemption. The objecting creditor seeks summary judgment on his objection to discharge. Because the Court finds the undisputed facts do not establish any improper intent to hinder, delay or defraud creditors, other than an intent to utilize available exemptions when the need to do so became evident, the motion for summary judgment is denied.

**Facts**

The following facts are undisputed.

On July 12, 2001, Marvin and Fay Crater ("Debtors") were served with a suit filed by creditor James Murphey ("Murphey") for royalties due under a patent license. Murphey obtained a default judgment in that suit for more than $600,000 in October, 2001, although that judgment was subsequently vacated because it had been entered in violation of the automatic stay.

Debtors retained a bankruptcy attorney on July 26, 2001, who sent a letter informing Murphey that he had been retained to file Chapter 7 for the Debtors. On or about that same day the Debtors sold some stock they owned in Krispy Kream for about $40,000. On September 10, 2001, the Debtors used the proceeds of that sale to pay Chase Manhattan Mortgage ("Chase") approximately $40,000, which largely satisfied a second mortgage Chase held against their home. Debtors filed

this Chapter 7 case 17 days later, on September 27, 2001.

Murphey filed a timely complaint objecting to the Debtors' discharge. Among other grounds, the complaint objected pursuant to 11 U.S.C. § 727(a)(2)(A),[1] on the ground that the sale of the Krispy Kream stock was made with "intent to hinder, delay, or defraud a creditor," by essentially converting Debtors' nonexempt asset into an increased homestead exemption. Arizona has opted out of the federal exemptions[2] and permits a homestead exemption up to $100,000 in equity.[3] Debtors' Schedule D claims their home is worth $100,000 and is subject to a $32,700 first lien and a $2,577 second lien held by Chase. Consequently their current homestead exemption is approximately $64,712 in equity, whereas but for the application of the stock sale proceeds it would have been only $24,232, and the Chapter 7 Trustee would have had an additional $40,000 of unencumbered assets to distribute to creditors.

Murphey moved for summary judgment. His principal argument is that actual intent to hinder, delay or defraud creditors can be shown by circumstantial evidence, and that it is shown by the "badges of fraud" because the Debtors sold essentially all their nonexempt assets shortly after being sued, and used the proceeds to increase their homestead exemption shortly before filing bankruptcy.[4]

**General Principles**

The question of whether a discharge should be denied because a debtor convert-ed nonexempt assets into exempt assets shortly before filing has been addressed in some significant cases in other circuits. *See, e.g., Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562 (7th Cir.1989); *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988); *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866 (8th Cir.1988); *Ford v. Poston (In re Ford)*, 773 F.2d 52 (4th Cir. 1985); *First Texas Sav. Assoc., Inc. v. Reed (In re Reed)*, 700 F.2d 986 (5th Cir. 1983). But it does not appear to have been addressed by the Ninth Circuit at least since the adoption of the Bankruptcy Code.

There is, however, substantial Ninth Circuit case law addressing the elements, evidentiary standards, and burden of proof for denial of discharge under § 727(a)(2)(A).

■ "Denial of discharge is a harsh result." *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1283 (9th Cir.1996). "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *Id.* at 1281, citing *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985).

Section 727(a)(2)(A) provides that a debtor may be denied a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor, ... has transferred ... property of the debtor, within one year before the date of the filing of the petition;

---

1. Unless otherwise noted, all statutory and rule references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330, and the Federal Rules of Bankruptcy Procedure.

2. Arizona Revised Statutes ("A.R.S.") § 33–1133(B).

3. A.R.S. § 33–1101(A).

4. There is some indication in Murphey's motion that the transfer did not in fact occur until after the petition was filed. Debtor denies that, however, so to the extent Murphey relies on that argument there is a material issue of fact that precludes summary judgment.

..." Here is it undisputed that the Debtors transferred their Krispy Kream stock within one year of the petition, so the only issue is whether such transfer was made with the requisite "intent to hinder, delay or defraud a creditor."

To a deny a discharge under § 727(a)(2)(A), the intent must be actual intent, as "[c]onstructive fraudulent intent cannot be the basis for denial of a discharge." *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986); *Devers*, 759 F.2d at 753. But that requisite intent need only be shown by a preponderance of the evidence, not the heightened standard the common law often requires for a showing of fraud. *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). And an intent to *defraud* need not be shown, as "[i]ntent to hinder or delay is sufficient." *Bernard*, 96 F.3d at 1281. That intent, though it must be actual, may be inferred "from the circumstances surrounding the transaction." *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992).

Although the "badges of fraud" that were recognized at common law and are now codified in the Uniform Fraudulent Transfer Act [5] for finding an actual fraudulent conveyance are not codified in the Bankruptcy Code either for that purpose or for denial of discharge under § 727(a)(2)(A), *Woodfield* seems to suggest that they are at least appropriate circumstances that may be considered as a basis to infer that intent. *Id.* Indeed, that opinion could be read to say that the presence of some of the badges of fraud may be sufficient to infer the requisite intent "unless some other convincing explanation appears." *Id.* But that was dictum because the opinion also noted that "[m]ore than a dry checklist of badges of fraud demonstrates the Debtor's intent, however," because those debtors admitted they "were trying to delay or prevent seizure of the assets," and they omitted them from their statement of affairs. *Id.* at 519.

### Evidentiary Standards

The plaintiff, of course, always has the ultimate burden of proof. Bankruptcy Rule 4005. But depending on the procedural context, there are at least three possibly applicable evidentiary standards. The lowest of them is when the bankruptcy court has conducted a full trial and found that the discharge should be denied. Because the standard of review on appeal for the factual finding of the requisite intent is the clearly erroneous standard, *Devers*, 759 F.2d at 753, it will take only a modi-

---

5. *See, e.g.,* A.R.S. § 44-1004(B), codifying UFTA § 4(b):

"In determining actual intent under subsection A, paragraph 1, consideration may be given, among other factors, to whether:

1. The transfer or obligation was to an insider.

2. The debtor retained possession or control of the property transferred after the transfer.

3. The transfer or obligation was disclosed or concealed.

4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

5. The transfer was of substantially all of the debtor's assets.

6. The debtor absconded.

7. The debtor removed or concealed assets.

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

cum of evidence of fraudulent intent to sustain the bankruptcy court's finding. Possibly equal to that standard, but possibly a higher standard, is the strength of the evidence necessary at trial to shift the burden of going forward from the plaintiff to the debtor, to explain the innocence of his transactions and intent. The Fifth Circuit described that point as when plaintiff "makes a prima facie case." *Reed,* 700 F.2d at 992. In this precise context, *Reed* held that it is only upon a showing of fraud by the creditor, that the burden shifts to the Debtor to explain the transaction. *Id.* Finally, the highest standard is that required of a plaintiff to obtain summary judgment when the debtor has denied any fraudulent intent, because the court must then be convinced that no fact finder could infer that the debtor's intent was innocent. But generally "scienter should not be resolved by summary judgment," *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir.1996), so "credibility issues are to be left to the trier of fact to resolve on the basis of oral testimony *except* in extreme cases." *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998)(emphasis in original).

■ Because this is summary judgment, plaintiff must satisfy that highest standard. Mere presentation of facts that could sustain a factual finding of fraudulent intent, or even establishment of a prima facie case, will not necessarily be sufficient to win summary judgment, if on such undisputed facts a fact finder could infer that the debtor's intent was innocent.

**Exemption Planning Is Permissible, Absent Extrinsic Fraud**

■ So far as this Court has seen, the authorities are unanimous that even though an actual intent to convert nonexempt assets into exempt assets shortly before filing bankruptcy *is* necessarily an intent to hinder or delay creditors, such

intent and conversion by themselves do not compel denial of discharge under § 727(a)(2)(A). The Ninth Circuit Bankruptcy Appellate Panel has so held. *Coughlin v. Cataldo (In re Cataldo),* 224 B.R. 426, 429 (9th Cir. BAP 1998), quoting *Roosevelt v. Ray (In re Roosevelt),* 176 B.R. 200, 208 (9th Cir. BAP 1994)("[I]t is clear that in the Ninth Circuit a debtor may convert non-exempt property into exempt property even on the eve of bankruptcy.")(dictum). This is because such a conclusion would be contrary to the very purpose of providing exemptions, and because the ability to make intelligent use of the exemptions was specifically addressed and permitted by the legislative history of the Code:

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing of the bankruptcy petition. This practice *is not* fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law. (Emphasis in original).

H.R. REP. 95–595, at 361 (1977), *reprinted in,* 1978 U.S.C.C.A.N. 5963, 6317; S. REP. No. 95–989 at 76 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5862, *quoted in, Tveten,* 848 F.2d at 874; *Reed,* 700 F.2d at 990; and *Cataldo,* 224 B.R. at 429.

In this case, the exemption planning occurred by payment of a valid debt. This creates a second reason why such exemption planning is not fraudulent. When a debtor is insolvent, the payment of any one creditor may inherently delay others, and that may even be the debtor's actual intent in paying the one creditor, either to increase the equity in an exempt asset such as here, or simply to prefer that creditor over others. And yet it has always been the law that such an intent to prefer one creditor, while delaying others, does not make a preference into a fraudulent con-

veyance, even though it would technically fit the terms of that statute.[6] *Coder v. Arts,* 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909)(construing Act § 67e); *Irving Trust Co. v. Chase Nat'l Bank,* 65 F.2d 409, 410 (2d Cir.1933)("Pro tanto every preference hinders and delays [other creditors]. If the debtor is aware that it will necessarily have that result, the transfer would seem to be made with an intent to hinder, delay and defraud other creditors; yet the securing or paying of an actual debt, in good faith, without any design injurious to creditors beyond that implied in giving the preference, was not deemed a fraudulent conveyance under the principles of the common law and the statute of Elizabeth. Nor is it so under the Bankruptcy Act."(citations omitted)); 4 COLLIER ON BANKRUPTCY ¶ 67.37, at 535 (14th ed. 1978)("The intent to delay or hinder seemingly implicit in any *preferential* transfer by an insolvent debtor has, however, been held not to constitute the actual fraudulent intent required under former § 67e [the attempted codification of *Dean v. Davis,* 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917)]. This interpretation of the familiar words, 'with intent to hinder, delay or defraud,' surely holds true for [Act] § 67d(2)(d) [actual fraudulent conveyance]."); II GERRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES § 382, at 662 (rev. ed. 1940)("[A] preference cannot be turned into a fraudulent conveyance by a mere finding that the debtor intended to defraud his creditors, if the other findings show only a preference and nothing more.").

The circuit courts that have addressed the issue also agree, however, that such a conversion of nonexempt into exempt assets can result in the denial of the discharge if there was extrinsic evidence of actual intent to defraud. *Reed,* 700 F.2d 986; *accord, Tveten,* 848 F.2d at 874 (discharge may be denied "if there was extrinsic evidence of the debtor's intent to defraud creditors"); *Cataldo,* 224 B.R. at 430 ("[In] Section 727(a) proceedings, many courts disregard both the amount claimed exempt and any evidence of the debtor's desire to shield assets, instead denying discharge 'only where the debtor has committed some act extrinsic to the conversion which hinders, delays or defrauds,'" quoting, *Smiley,* 864 F.2d at 567).[7]

These principles also reflect the law of the Ninth Circuit under the Act, which the legislative history quoted above was intended to incorporate into the Code.[8] Un-

---

**6.** There is now an exception to this broad statement in states that have adopted the Uniform Fraudulent Transfer Act § 5 as originally drafted, which makes insider preferences fraudulent. Section 5(b) of the UFTA provides: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider has reasonable cause to believe that the debtor was insolvent." Arizona, however, did not adopt that provision. *See* A.R.S. § 44–1005 (codifying UFTA § 5(a) and eliminating § 5(b)).

**7.** While the circuits are in apparent agreement on this principle, none of them seems to have noticed the difference between the Sev-

enth Circuit's rule as stated in *Smiley,* which requires an extrinsic *act,* and the Fifth and Eighth Circuit formulations, which only require extrinsic *evidence* of the prohibited intent. Here, there is no act extrinsic to the conversion of exempt into nonexempt assets, yet the creditor argues that the timing of that act is such evidence of the prohibited intent. But if an extrinsic fraudulent or delaying act is required, why is not that act alone sufficient to deny the discharge wholly apart from the exemption planning?

**8.** In fact, one authority suggests that it was precisely these Ninth Circuit cases that were referred to in the legislative history quoted above, based on a letter from a California bankruptcy judge, who described this state of

der the Act, the Ninth Circuit held that the mere conversion of nonexempt assets to exempt assets, even on the eve of bankruptcy, would not without more result in a denial of the exemption.[9] *E.g., Wudrick v. Clements,* 451 F.2d 988 (9th Cir.1971)(upholding exemption for money borrowed against unencumbered vehicles and placed into a credit union where it was exempt under California law); *Goggin v. Dudley,* 166 F.2d 1023 (9th Cir.1948), *aff'g* 72 F.Supp. 943 (S.D.Cal.1947)(upholding exemption for $1,000 of exempt Building and Loan Association stock purchased one week prior to voluntary petition). But the exemption could be denied if there was other evidence of actual fraud. For example, if the money invested into an exempt asset were derived from the sale of stock that had been pledged to a bank and released on the debtor's fraudulent promise to apply the proceeds to the bank's loan, the trustee could use the strong arm clause to assert the rights of the defrauded bank and avoid the debtor's claimed homestead exemption. *Miguel v. Walsh,* 447 F.2d 724 (9th Cir.1971).

The Ninth Circuit authority most expansive on this issue is *Goggin v. Dudley,* which adopted the opinion of the District Court. In that case the debtor had purchased $1000 of exempt stock in a building and loan association just one week prior to filing a voluntary petition, when he was "heavily in debt and clearly insolvent." 72 F.Supp. at 944. The Trustee denied the

exemption, which was affirmed by the Referee, but then reversed by the District Court, which was upheld by the Ninth Circuit. In reversing, the District Court noted that "If the mere acquisition of exempt property while insolvent were sufficient ground to destroy the exemption, the acquisition of any such property, within the four-months' period, could be nullified, and the protection which the state law gives to a debtor, even against the solemn money judgement of a court, would be denied him against creditors in bankruptcy." *Id.* at 947. And in response to the Referee's focus on the acquisition while insolvent, the District Court held that if such a fact could render the exemption fraudulent, it would read into the exemption restrictions that were not there:

> [The California exemption statute] does not say when building and loan stock must be acquired in order to be exempt. Nor does it say that the person shall be solvent at the time of acquisition. To sustain the Referee in this case, we would have to impose a time limit and make solvency a condition precedent to exemption. This would mean reading into the state statute restrictions which are not there. And this we cannot and should not do. And, as there is no showing of actual fraud, the stock is immune against the creditors and never passed to the trustee.

the law in the Ninth Circuit and noted the law was "in a state of utter confusion in other circuits." *In re Kravitz,* 225 B.R. 515, 518 (Bankr.D.Mass.1998).

**9.** These Ninth Circuit authorities under the Act technically dealt only with objections to the claimed exemption. For opt-out states under the Code, the availability of the exemption should be controlled by state law, whereas the denial of discharge under § 727(a)(2) is governed by federal law. This distinction is implicit in *Cataldo,* and is well illustrated by

the two decisions in *Reed,* one of which upheld the exemption, and the other of which denied the discharge. *Driskill v. Reed (In re Reed),* 12 B.R. 41 (Bankr.N.D.Tex.1981) and *Reed,* 700 F.2d 986. But the legislative history that all the authorities rely on, which says the conversion of nonexempt property into exempt property is not fraudulent as to creditors, really speaks to the § 727 issue and therefore makes these Ninth Circuit cases applicable to the § 727 context.

*Id.* at 947. The opinion had earlier summarized this conclusion: "The doctrine bearing upon conveyances made to hinder, delay, or defraud creditors has no application to the creation of a homestead." *Id.* at 946.

The issue these authorities leave open, and the determinative issue here, is whether proof of one or more of the badges of fraud may be used to infer the extrinsic actual fraud that is required to deny a discharge to a debtor who converted nonexempt into exempt assets.

### Certain Badges of Fraud Alone Do Not Imply Actual Fraud

As noted above, the "badges of fraud" are not codified as appropriate grounds for denial of discharge pursuant to § 727(a)(2)(A). But they have been long recognized at common law as grounds for finding the identical statutory element that is found in § 727(a)(2)(A)—"actual intent to hinder, delay or defraud"—when it is an element of a fraudulent transfer. And *Woodfield* suggests, but does not hold, that the badges of fraud are relevant considerations for purposes of § 727(a)(2)(A).

The question is whether some of them, or which of them, may be sufficient to find the "actual fraud" that must accompany a conversion of nonexempt into exempt assets if it is to result in a denial of discharge.

The badges of fraud may be categorized into three types. Some of the badges are themselves indicative of concealment, deception or fraudulent intent: 2. The debtor retained possession or control of the property transferred after the transfer;[10] 3. The transfer or obligation was ... concealed; 6. The debtor absconded; and 7. The debtor removed or concealed assets.

A second category of badges consists of three of them that do not implicitly suggest fraud but do suggest there must have been a motivation other than the transaction itself because it was not an economically rational decision for a debtor to make but for its effect to hinder or delay creditors: 1. The transfer or obligation was to an insider;[11] 8. The value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; 11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The third category, however, consists of badges that may be innocent in themselves, or are merely timing factors that become suspicious only when combined with other factors: 4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; 5. The transfer was of substantially

---

**10.** Transfer without change of possession was considered fraudulent at the inception of fraudulent conveyance law over 400 years ago. *See Twyne's Case,* 3 Coke Rep. 80b (1601). *See also* A.R.S. § 44–1061(A): "A sale made by a vendor of goods and chattels ..., unless the sale or assignment is accompanied by an immediate delivery and followed by an actual and continued change of possession of the things sold or assigned, is prima facie evidence of fraud against creditors of the vendor ...."

**11.** A insider transfer suggests the debtor did not seek to maximize his economic benefit by exposing the asset to the market to obtain the highest possible price. But it could also fall in the first category, because insider sales may also facilitate a secret retention of possession, control or benefit. Of course it could also evidence an intent to benefit the insider, a potential classic fraudulent conveyance if made while insolvent without receipt of fair equivalent value. And under UFTA § 5(b), even payment of a valid insider debt while insolvent may be fraudulent. *See* note 6 *supra.*

all of the debtor's assets; 9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and 10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

Here, the plaintiff creditor has established only that (1) the Debtors sold the asset shortly after being served with suit, (2) the asset was the Debtors' only significant, unencumbered nonexempt asset, and (3) the sale of the asset and the use of the proceeds to pay down a second home mortgage and thereby increase the equity protected by the homestead occurred shortly before the filing of bankruptcy and, implicitly, while insolvent. Thus the creditor has established badges 4 and 5 and 9, all of them in the third category.

Notably, none of the badges that the creditor has established here is implicitly indicative of fraudulent intent. They do not even fall into the second category of transactions that are suspicious because they lack an economically rational purpose. For example, the creditor has not shown that the Krispy Kream stock was appreciating, or generating dividends, in excess of the interest the debtor was paying on the second mortgage. Rather, they are merely timing factors.

If conversion of nonexempt into exempt assets should not itself result in denial of discharge, should it do so when it occurs shortly after the debtor has been sued or incurred a large debt, or is insolvent, or is about to file bankruptcy? If that were the rule, it would mean that prospective debtors could engage in exemption planning only up until the point where it appeared they might need to do so. As the court noted in *Goggin v. Dudley,* this would be to add a restriction to the exemption that

the legislature (and Congress) did not impose, *i.e.,* certain assets are exempt only if purchased while solvent, while not owing substantial debts, or some significant period of time prior to levy of execution or bankruptcy. It would be particularly inappropriate to impose such a judge-made time condition on an exemption, such as the homestead, when the legislature did not do so but did so with respect to other exemptions. For example, while Arizona imposes no time limit on obtaining or declaring a homestead, it does require that life insurance policies must have been continuously maintained for two years in order to be exempt, and excludes from the exemption cash surrender values that were increased by premium payments within the prior two years in excess of the average annual premium paid during the previous three years. A.R.S. §§ 33–1126(A)(6) & (B). The Arizona legislature knows how to curb abusive exemption planning when it sees the need to do so.

Moreover, if intentional conversion of nonexempt into exempt assets is not *per se* fraudulent as to creditors, what is the additionally fraudulent[12] nature of the intent that is evidenced by such a conversion occurring shortly after being sued, while insolvent, and shortly before filing bankruptcy? It would seem to be merely evidence that the debtor intended to maximize his assets that would be shielded from creditors, and probably had one specific creditor in mind, and probably knew that his assets were insufficient to satisfy all his creditors. But such intent is nothing more than the intent to convert nonexempt into exempt assets, which all authorities agree is not fraudulent. So how could the timing of the conversion, or the pressure of a

---

**12.** The term "fraudulent" is used here generically to include also the prohibited intent to hinder or delay creditors.

single creditor, cause that same intent to result in a denial of discharge?

Indeed, what if the transaction did not make economic sense, standing alone? The scenario is not uncommon in the exemption planning discharge cases, and it yields conflicting results even within the same circuit, as one debtor may get a discharge despite buying an exempt $10,000 shotgun that he does not need,[13] but another is denied the opportunity to buy a homestead that he does not need.[14] For example, what if the Krispy Kream stock were generating income far in excess of the interest rate being paid on the second mortgage, and promised to do so for the foreseeable future? What would that say about the debtor's intent? It could certainly be argued that it disproves an "innocent" explanation of the transaction, i.e., it belies an argument that the debtor thought it was a better use of his money to pay down his homestead mortgage. But what does that prove? It proves that the intent really was to maximize the exemption, even at a sacrifice of income. But that still is nothing more than an intent to convert nonexempt into exempt assets. All that the uneconomic nature of the transaction does is highlight the strength and focus of the intent, but if the intent is not objectionable, then neither should be the same intent when strongly felt and focused on a particular creditor.

■ Consequently this Court tentatively concludes that those badges of fraud that are not intrinsically indicative of fraudulent intent are not sufficient evidence of actual fraud to compel a denial of discharge. To be more precise, those badges

of fraud that fall into the second and third categories identified above are neither sufficient to sustain summary judgment for the creditor, nor to shift the burden of going forward to the debtor. In short, they do not establish a prima facie case for denial of discharge, even when conjoined with prebankruptcy exemption planning. They really do nothing more than demonstrate that the debtor engaged in otherwise permissible exemption planning only when it became apparent that it would be intelligent to do so, and was willing to sacrifice some asset values to achieve the exemption.

This tentative conclusion must be tested against the existing case law, both in the Ninth Circuit and elsewhere.

**Ninth Circuit Cases Do Not Find Timing Factors and Uneconomic Transactions Sufficient to Establish Fraud.**

The tentative conclusion is certainly consistent with, if not compelled by, Ninth Circuit precedent. *Goggin v. Dudley* essentially rejected timing factors as a basis to deny an exemption, and given § 727's legislative history indicating an intent to preserve the existing ability to convert nonexempt into exempt assets, there is no reason to conclude the result should be different under the Code. It is also consistent with *Miguel v. Walsh*, where there was actual extrinsic fraud, in that the debtor fraudulently induced the bank to part with its collateral on a promise to use its sale proceeds to pay down the bank's debt. And it is not inconsistent with *Woodfield*, where although the court relied on many of the third category timing badges, there also existed the suggestive fraudulent ele-

---

13. In *In re McCabe*, 280 B.R. 841 (Bankr. N.D.Iowa 2002), the debtor bought a $10,000 Belgian Browning shotgun which he fired once or twice, because he knew Iowa had no dollar limit on the exemption for a family gun, and yet he was allowed his discharge.

14. In *Jensen v. Dietz (In re Sholdan)*, 217 F.3d 1006 (8th Cir.2000), the ninety year old debtor moved out of assisted care facility into a homestead purchased with all his exempt assets, and the exemption was denied.

ment of an insider transaction, and there were explanations that lacked credibility and were therefore deceptive. *See* 978 F.2d at 518–19.

*Wudrick* could be read as establishing an even broader rule upholding exemptions and discharges. In *Wudrick*, the debtors in the two cases consolidated for decision both borrowed money against their cars to obtain the funds to put into the exempt credit union accounts. 451 F.2d at 989. It is highly likely, although the Ninth Circuit did not comment on it, that the interest rates the debtors had to pay on the auto loans exceeded the interest rates that could be earned on the savings accounts. If so, then the transactions were not economically rational decisions for the debtors to make, but for the obtaining of the exemption. The fact that the Ninth Circuit upheld the exemptions indicates that even the second category of badges of fraud—noneconomic decision making—is not sufficient to make a prima facie case to deny the discharge. Indeed, because the Ninth Circuit's opinion reversed the district court's affirmance of the referee's denial of the claimed exemption in one of the two cases, it may stand for the proposition that the second category of badges of fraud does not even constitute evidence of the requisite fraudulent intent.

It should be remembered that these Ninth Circuit Act cases have significance beyond the Ninth Circuit, because they were apparently the Act authorities the House and Senate Reports were referring to when they said "As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing of the bankruptcy petition." [15]

## Most Other Circuit Decisions Are Consistent

 The tentative conclusion is consistent with *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562 (7th Cir.1989). The Seventh Circuit's analysis of the case law on this issue is useful in categorizing the cases into three camps. The first denies the discharge if the exemption planning was intentional, even without other evidence of fraud. The Seventh Circuit, like this Court, rejects that analysis as rewarding ignorant debtors and punishing knowledgeable debtors. 864 F.2d at 567. The second camp bases denial of discharge on the amount attempted to be exempted, essentially creating a judge-made cap on exemptions at the level the court concludes is necessary for the "fresh start," rather than the "head start." *Id.*, citing *In re Reed*, 11 B.R. 683, 688 (Bankr.N.D.Tex.1981). For the reasons eloquently set forth in the *Tveten* dissent, this Court agrees it is inappropriate for judges to determine when pigs become hogs [16] when the legislature has failed to do so and has not invited the courts to exercise that judgment.[17] Finally, there

---

**15.** *See* H.R. REP. 95–595, at 361 (1977), reprinted in, 1978 U.S.C.C.A.N. 5963, 6317; S. REP. No. 95–989 at 76 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5862, quoted in, *Tveten*, 848 F.2d at 874; *Reed*, 700 F.2d at 990; and *Cataldo*, 224 B.R. at 429. *See* note 8 *supra*.

**16.** The dissent in *Tveten* criticized the majority's reasoning by comparing it to that in *Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 157 (Bankr.D.N.M.1981), where the bankruptcy court denied the discharge based on the "principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered." *Tveten*, 848 F.2d at 879 (Arnold, J., dissenting).

**17.** In fact, this appears to be the issue that makes this area so difficult. Virtually all of the difficult cases deal with state exemption statutes that are unlimited in amount. The cases simply do not arise with any frequency, or at least do not reach the circuit courts, when the state legislature has imposed caps

are those cases, with which the *Smiley* court agreed, that did not limit debtors' full use of exemptions within the limits of the law. 864 F.2d at 567. The *Smiley* court ultimately concluded the discharge should be denied because the debtor not only invested money into an unlimited Kansas homestead, but lied to his creditors about the retained value of his assets that had been liquidated to generate those funds. *Id.* at 568. Because such false statements and concealment fall into the first category of fraudulent badges of fraud, it is consistent with this Court's tentative conclusion on the present facts, where there is no false statement or concealment of assets.

The conclusion is consistent with *Marine Midland Bus. Loans, Inc. v. Carey*, 938 F.2d 1073 (10th Cir.1991). The facts there were essentially the same as in this case, in that nonexempt assets were liquidated and the proceeds used to reduce the mortgage on the homestead. The debtor was left with a $300,000 exempt Oklahoma homestead subject only to a $30,000 mortgage. *Id.* at 1076. The bankruptcy and district courts found there was no improper intent, and the Tenth Circuit affirmed:

> The liquidation of the other assets used to pay down the home mortgage occurred over a two year period and was in the open; the activity and payment appears to be consistent with what has been approved by Congress to take advantage of exemptions. [Debtor] fully disclosed all payments and transfers in her bankruptcy schedules and at the meeting of creditors. [Debtor] retained

no beneficial interest in any converted property. She did not obtain credit to purchase exempt property. Under these circumstances we cannot say that the district and bankruptcy courts erred in finding she did not intend to "hinder, delay, or defraud" her creditors or acted improperly in relation to her homestead.

*Id.* at 1078.

More difficult to harmonize under the analysis proposed here is *Ford v. Poston (In re Ford)*, 773 F.2d 52 (4th Cir.1985), but its result may have hinged primarily on the debtor's perceived lack of candor. There the debtor had owned land as his sole and separate property for over six months. When a creditor obtained a judgment against him, however, he deeded it the very next day to himself and his wife as tenants by the entireties, which under Virginia law put it beyond the reach of a creditor holding a debt against only one of the spouses. 773 F.2d at 53. After trial, the bankruptcy court denied the discharge, which the Fourth Circuit affirmed. Although the Fourth Circuit's opinion requires "*extrinsic* evidence of actual intent to defraud creditors," *id.* at 55 (emphasis in original), the bankruptcy court apparently relied almost solely on the timing of the transfer. It could be, however, that the bankruptcy court also relied on a finding that the debtor's explanation of the transaction—that he was merely correcting a mistake that had been made when he took title—was simply incredible, and therefore the debtor testified falsely and sought to conceal his true intent.[18] The

on exemptions. This case, however, is an exception to that general observation.

**18.** Perhaps *Ford* counsels that it would be unwise to grant *debtors* summary judgment in such cases where the only badge of fraud a creditor asserts relates to timing—because the debtor should be required to explain the transaction, and the discharge should be denied if the explanation is not credible. If so, that would mean that any badge of fraud could make a prima facie case sufficient to shift the burden of going forward to the debtor. But the rule suggested here would still mean that if the debtor testified honestly, like Mr. Tveten, then the creditor's case is insufficient to deny the discharge. But that issue is

Fourth Circuit's opinion seems to suggest that was the case, by describing the debtor's explanation as "conveniently choosing to correct, at that point in time, what was then a six-month old mistake." *Id.* Perhaps that lack of candor could be deemed sufficient evidence falling in the first category to warrant a denial of discharge.[19]

The tentative conclusion is consistent with *First Texas Sav. Assoc., Inc. v. Reed (In re Reed)*, 700 F.2d 986 (5th Cir.1983). As a threshold matter, it should be noted that *Reed* was not a granting of summary judgment to the objecting creditor, but an affirmance of the bankruptcy court's denial of discharge after trial, 700 F.2d at 992, so the evidentiary standard was much lower than is required here. But the facts in *Reed* also clearly included some that were intrinsically indicative of fraudulent intent, and many others that were not economically rational. Reed hid accounts from his creditors and sold assets, to insiders, for less than their acquisition cost only a short time before. Certainly such facts were sufficient to sustain a trial court's factual finding of fraudulent intent, particularly when coupled with what must have been the trial court's consideration of the debtor's demeanor.[20] Such facts may even be sufficient to make a prima facie case and shift the burden to the debtor to provide the innocent explanations of the transac-

tions, and therefore to sustain summary judgment if the debtor fails to come forth with such an explanation.

The panel decision in *NCNB Texas Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056 (5th Cir.1990), would have been more difficult to harmonize with this analysis, but it was reversed *en banc*. 932 F.2d 1100 (5th Cir.1991). The debtor there had liquidated nonexempt assets and used some of the proceeds on luxuries and some to pay down his homestead mortgage two weeks after engaging a bankruptcy lawyer and just two weeks before filing bankruptcy. The bankruptcy court allowed the discharge, but the Fifth Circuit panel reversed, concluding that the bankruptcy court had only found no intent to *defraud*, but had not addressed an intent to hinder or delay. 916 F.2d at 1060. The opinion referenced the "pig to hog" analysis but found "especially critical to finding extrinsic evidence of an intent to hinder or delay" was that the debtor's wife carried $18,000 of the proceeds in her purse rather than depositing it into the money market account at the plaintiff bank, and the homestead was paid down through a cashier's check payable to her rather than a personal check payable to the mortgage company, suggesting an effort to conceal the transactions from the plaintiff bank.

---

not presently before the Court, and therefore need not be decided now.

**19.** Another case that may have hinged primarily on debtor's apparent lack of candor is *Pomerantz v. Pomerantz (In re Pomerantz)*, 215 B.R. 261 (Bankr.S.D.Fla.1997). In that case the debtor purchased a Florida homestead within 20 days of the plaintiff obtaining summary judgment on a $250,000 debt. Debtor testified that she moved to Florida because she had received a job offer there, but then did not take the job for another 18 months, during which time she had virtually no other income and was living off of borrowing against the exempt asset. *Id.* at 264.

**20.** When Reed could not adequately account for $19,000 that he carried in cash he argued that it was but a small percentage of the amount of money he went through in that year. *Reed*, 700 F.2d at 989. He justified sales of assets for less than what he paid for them not long before by noting that if he had received more it would have been invested in exempt assets as well. *Id.* He did not explain his purchase of stock in Triple BS Corporation one month before filing bankruptcy, or the significance of the initials. *Id.* n. 1.

*Id.* But on rehearing *en banc*, the Fifth Circuit reversed itself and affirmed the bankruptcy court's factual finding of a lack of any extrinsic evidence of intent to defraud, distinguishing *Reed* because the fact finder there had found such intent, and the "debtor's conduct was more egregious" than Bowyer's. 932 F.2d at 1102.

### Eighth Circuit Cases Are To the Contrary

But while the Fifth Circuit decisions can be seen as consistent with the proposed analysis, the Eight Circuit decisions cannot. *Norwest Bank Nebraska, N.A. v. Tveten (In re Tveten)*, 848 F.2d 871 (8th Cir.1988), seems to hold that it is sufficient to deny the discharge if the amount converted into exempt assets is "too much," and *Jensen v. Dietz (In re Sholdan)*, 217 F.3d 1006 (8th Cir.2000), seems to hold that the discharge may be denied if the investment in exempt assets was unwise, uneconomical or unusual from the debtor's perspective.

*Tveten* was an affirmance of the bankruptcy court's denial of discharge after trial, so it was the lowest standard summarized above. Nevertheless, the bankruptcy court had relied almost exclusively on the timing factors—the debtor's knowledge of a judgment against him, his rapidly deteriorating investments, and the rapidity with which he converted nonexempt into exempt assets in 17 separate transfers shortly before bankruptcy. About the only fact mentioned that falls outside the third, timing category is that a number of the transfers were to his parents and brother, *Id.* at 872, which raises two flags—the sale to a family member may be fraudulent in that it permits the debtor to retain possession or control of the asset, or may be uneconomic because of the likelihood that someone other than a family member might have paid more if the asset were adequately exposed to the market.

But one cannot read the *Tveten* opinion without concluding the majority was driven almost solely by the timing of the exemption planning and its size, almost $700,000. And that was not only how the *Tveten* dissent read the majority's analysis, but also how the Eighth Circuit subsequently read it. In *Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 82 (8th Cir. 1989), the court summarized the kind of extrinsic evidence of fraud necessary to deny a discharge, in terms consistent with the analysis proposed here: "further conduct intentionally designed to materially mislead or deceive creditors about the debtor's position; conveyances for less than fair value; or, the continued retention, benefit or use of property allegedly conveyed together with evidence that the conveyance was for inadequate consideration." But then it added:. "*Tveten* establishes that where an exemption, other than a homestead exemption, is not limited in amount, the amount of property converted into exempt forms and the form taken may be considered in determining whether fraudulent intent exists." Id. *Johnson* ultimately concluded that "*Tveten* does not apply to homestead exemptions absent traditional extrinsic evidence of fraud unrelated to the amount of money involved," and pointedly reminded "the lower courts that there is nothing fraudulent per se about making even significant use of other legal exemptions." *Id.* at 83. "The power sanctioned in *Tveten* should be reserved for exceptional cases and has no application to homestead exemptions." *Id.* at 84.

But then the Eighth Circuit retreated from *Johnson.* In *Jensen*, the debtor was ninety years old, afflicted with serious medical problems and living in an assisted care facility. 217 F.3d at 1010. When he was sued in a personal injury suit for an amount far in excess of his insurance cov-

erage, however, he liquidated his bank accounts and purchased a newly built house, even though the property taxes on the house were $2000 per year while the debtor was living on social security that left him with only $600 per year disposable income. *Id.* On those facts, the Eighth Circuit upheld the bankruptcy court's finding of "ample evidence extrinsic to the mere conversion of assets that showed fraudulent intent on the part of the debtor." [21] *Id.* at 1010–11. The Eighth Circuit's effort to summarize that extrinsic evidence that showed fraudulent intent was unenlightening:

> It is one thing to convert non-exempt assets into exempt property for the express purpose of holding it as a homestead and thereby putting the property beyond the reach of creditors. (citation omitted). However, it is quite another thing to acquire title to a house for no other reason than to defraud creditors.

*Id.* at 1011.

The facts in *Jensen* well fit the second category of the badges of fraud, because the debtor's investment in the homestead was either uneconomical or an unwise investment for that particular debtor. But the Eighth Circuit's opinion fails to demonstrate how that made the intent any more fraudulent than a clear intent to convert nonexempt into exempt assets. The closest it came to such an explanation was to label the transaction "rank injustice." *Id.* Indeed, the inability of the *Jensen* opinion to explain why converting assets into exempt property for the purpose of putting it

beyond the reach of creditors is one thing, but purchasing a house for no other reason than to claim a homestead exemption is another, is a good demonstration that there is no such distinction to be drawn. As the dissent noted, the facts simply showed that the debtor "sought to protect as much of his assets as the law allowed," and none of the evidence was "extrinsic to [the debtor's] act of conversion," and "therefore [is] not evidence of fraud." *Id.* at 1011–12 (Arnold, J., dissenting).

## Conclusion

■ The Ninth Circuit cases discussed above may be sufficient to resolve the issue before the Court today. Neither timing factors nor uneconomic decision-making by debtors is sufficient to deny a discharge on account of knowledgeable exemption planning. They were not sufficient to deny exemptions under the Act, and even aside from the legislative history quoted above there is no basis to conclude that Congress intended a different result under the Code,[22] and certainly not to impose an even harsher remedy, complete denial of the discharge rather than denial of a claimed exemption.

It might also be sufficient to deny summary judgment on the basis that the requisite fraudulent intent is so individualistic and fact based that it cannot be determined without live testimony and the opportunity to judge the credibility of the debtor. *See In re Chavin,* 150 F.3d 726 (7th Cir.1998).

---

21. The objection was to the exemption, rather than to the discharge; the discharge was irrelevant because the debtor was deceased. The bankruptcy court relied on a fraudulent conveyance analysis and utilized the badges of fraud to find the fraudulent intent, which the Eighth Circuit approved, including the reliance on the debtor's age and the value of the house. *Id.* at 1009–10 & n. 5.

22. See *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992)("[T]his Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.").

■ But the analysis suggests an even stronger rule—unless the creditor shows a deception or concealment, an insider transaction, a fraudulent conveyance, a secretly retained possession or benefit, or debtor explanations that lack credibility, the second and third categories of badges of fraud are not sufficient to shift to the debtor the burden of going forward, even if all of the debtor's nonexempt assets were converted into exempt assets just after being sued and just before filing bankruptcy.

There are many areas of bankruptcy law where Congress apparently intended bankruptcy judges to weigh the evidence and utilize their experience and judgment to decide individual cases on a case by case basis. It does so by using terms that are inherently incapable of fine definition, such as "good faith," "substantial abuse," "undue hardship," and the like. Case law in such areas tends to identify "factors" that in reality are merely a checklist of relevant facts or issues to consider, none of which is dispositive. Perhaps such areas of bankruptcy law are best dealt with as in the civil system, with each judge reading and applying the statute and its underlying policies and principles to each factual situation that comes up, without regard to what the last judge did on different facts. Reported decisions in such areas serve little useful purpose, and in fact may be counterproductive.[23]

But this is not one of those areas. Congress did not invite bankruptcy judges to grant or deny the discharge based on an amorphous, individualistic finding such as "reasonable" or "good faith." Instead, it made the requisite determination hinge on intent, something that common law precedent has successfully refined over the centuries, particularly in tort law and in criminal law. Consequently here is it appropriate for courts to seek to refine and define the requisite intent, so that the evolution of precedent may in the long rung yield predictable, practical rules.

And this is an area of law where that effort is particularly needed and important. As noted by the *Tveten* dissent, "[d]ebtors deserve more definite answers" than "each bankruptcy judge's sense of proportion." 848 F.2d at 879 (Arnold, J., dissenting). Without more definite answers, "debtors will be unable to know in advance how far the federal courts will allow them to exercise their rights under state law." *Id.* The result will be that some debtors who relied on well intentioned advice of counsel may be denied a discharge, the bankruptcy equivalent of the death penalty, while others receive an unconscionable benefit, perhaps through ignorance or perhaps through cunning. And as the *Tveten* dissent also emphasizes, for the judiciary to deny an exemption that the legislature has provided simply because the judge finds it out of proportion is to invade the province of the legislative branch. *Id.* at 878.

Both the second and third categories of the badges of fraud merely underscore that the debtor intended to take advantage of available exemptions. The timing factors make that more evident than if the exempt property were purchased before bankruptcy was imminent, and engaging in an otherwise uneconomic transaction eliminates another possible motive, but neither of these makes the intent any more than an intent to utilize available exemptions. And since all authorities (except perhaps the Eighth Circuit) agree that that intent is not penalized or forbidden by

**23.** *See* Lawrence Ponoroff, *The Dubious Role of Precedent in the Quest for First Principles in the Reform of the Bankruptcy Code: Some Lessons from the Civil Law and Realist Traditions,* 74 Am. Bankr.L.J. 173 (Spring 2000).

§ 727(a)(2)(A), that intent is not transformed into something more evil by its timing or even by the size of the transaction. Fortunately the Arizona legislature has spared both debtors and judges problems such as *Tveten*, by imposing dollar limits on almost all exemptions, and an additional timing limitation on the only one readily capable of substantial prebankruptcy exemption planning.[24]

Based on the foregoing, the Court concludes that the showing of only the timing badges of fraud is insufficient to support summary judgment for Murphey. Because Murphey has made no showing of a badge of fraud falling in the first category, Murphey's motion for summary judgment is denied.